**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| **In re:**<br><br>**LAPEER AVIATION, INC.,** and<br>**CG ACQUISITIONS, L.L.C.,**<br><br>**Debtors.** | ) | **Case No. 21-31500-jda**<br>**Chapter 11 (Subchapter V)**<br>**Jointly administered**<br>**Honorable Joel D. Applebaum** |
| **LAPEER AVIATION, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MAYFIELD TOWNSHIP,**<br><br>**Defendant.** | ) | **Adv. P. No. 26-                    -jda** |

**COMPLAINT TO DETERMINE OWNERSHIP OF PERSONAL PROPERTY**

NOW COMES Plaintiff, Lapeer Aviation, Inc., by and through its attorney Winegarden, Haley, Lindholm, Tucker & Himelhoch, PLC, and for its Complaint to Determine Ownership of Personal Property states as follows:

**GENERAL BACKGROUND**

1. As this Court knows well, the history between Lapeer Aviation, Inc. ("LAI") and Mayfield Township ("Mayfield" or the "Township") is rife with controversy.
2. This Court confirmed LAI's Chapter 11 Plan on November 4, 2022, with it being fully expected that LAI would pursue the claims it holds against Mayfield for the benefit of LAI's creditors.
3. This Court previously saw the prelude to the bad faith conduct on the part of Mayfield that would later unfold.

4. As the Court may recall, much of this prelude related to Mayfield employee John Lewis.
5. Prior to the Court's decision on LAI's motion to assume its contracts with Mayfield, claimed that LAI had breached the management agreement by failing to provide a licensed airport manager.
6. Yet Mayfield itself had authorized LAI's airport manager, Sandra Swientoniowski, to sit for the licensing examination.
7. She passed. For a year, Mayfield accepted her work as the airport's only manager.
8. Mayfield then unilaterally reappointed John Lewis and withheld the signature Swientoniowski needed for her license.
9. At the hearing before this Court on LAI's motion to assume held on August 10, 2022, LAI called that sequence "evidence of bad faith."
10. In its later ruling on LAI's motion, this Court found that Mayfield had benefited from Swientoniowski's work, had withheld its signature "for no apparent reason," and that its refusal was "the sole reason" she remained unlicensed.
11. Applying the obligation of good faith inherent in the agreement, the Court found that Mayfield had concurred in her appointment as airport manager and that LAI had not breached the agreement.
12. Mayfield still did not relent.
13. Over a month later on September 27, John Lewis was still at the airport, and the dispute over who spoke for the airport had become a matter of flight safety.
14. At the September 27, 2022 hearing on LAI's motion for damages filed against Mayfield for its refusal to obey the prior order, the Court asked Mayfield's counsel

why its August ruling had not been enough for the Township to sign Swientoniowski's license and withdraw Lewis.

15. The Court identified the danger in allowing Lewis to issue airport-closure notices without coordinating with LAI while aircraft were in the air.
16. Towards the end of the hearing when Mayfield's counsel summarized the steps the Township would take to come into compliance with the Court's prior order, he did not mention John Lewis.
17. The Court drove the point home, stating: "you left off John Lewis."
18. The Court identified Lewis as Mayfield's employee or agent and directed Mayfield to tell him that he had no contractual right to be at the airport and had to stay away.
19. The Court warned that failure to do so could expose both Lewis and the Township to sanctions.
20. The next morning at a Court scheduled status conference, LAI's counsel reported that control of the airport notice system had finally been transferred, that he had been advised Lewis would no longer appear at the airport, and that the keys and other items associated with the position were at Township offices for LAI to collect.
21. LAI was hopeful that this Court's decisions would put an end to that conduct.
22. LAI would later learn that John Lewis was in fact at the airport without authorization prior to the end of LAI's contracts with Mayfield despite this statement and despite the Court's Order.
23. Unfortunately, while relevant, this is not the matter that brings LAI back before the Court. LAI seeks adjudication of a matter that is far more serious
24. Mayfield has doubled down on its bad faith conduct, attempting to avoid paying LAI by any means, including simply ignoring state court orders. *See* **Exhibit A**.

25. When this did not cause LAI to abandon its claims against Mayfield, Mayfield tripled down.

26. As set forth below, Mayfield suddenly claimed that the property listed in **Exhibit B** was Mayfield's property.

27. Mayfield claimed none of this property during the bankruptcy.

28. As further set forth below, this property is and always has been the property of LAI.

29. Mayfield's false claims exist for a singular purpose: to be used in bad faith to pressure LAI to give up contract claims whose proceeds the Plan commits to creditors.

30. For the reasons set forth herein, LAI asks this Court to declare that it owns the Exhibit B property, including but not limited to the lobby display cabinet and the FuelMaster, as that property is LAI's property which vested in LAI under its confirmed plan.

**LAI's sales counter and its purchase of the FuelMaster**

31. Mayfield owns the airport at 1232 Roods Lake Road in Lapeer, Michigan (the "D95 Airport" or "D95").

32. LAI, a Michigan corporation, operated the business that sold the fuel.

33. For years, pilots who bought fuel at the DuPont-Lapeer Airport paid at a glass-front sales counter in the terminal lobby.

34. The cabinet came to the airport with the DuPont family and stayed with the business when LAI was purchased by CG Acquisitions, L.L.C. ("CG")

35. LAI used the cabinets to display the headsets, oil and filters it sold to pilots. Photographs of the cabinet at issue are attached as **Exhibit C**.

36. In 2008, LAI bought a FuelMaster system from Oscar W. Larson Co. ("Larson") that allowed pilots to pay at the pumps.

37. Once pilots could fuel without a cashier, LAI's then-owner, Ray Larner, moved the cabinet across the lobby.

38. He had an opening cut in the wall to receive the cabinet that had previously stood on the lobby floor.

39. Larson billed LAI on September 26, 2008, under a June 16 contract. A copy of Invoice PB29448 is attached as **Exhibit D**.

40. Exhibit D identifies the "Fuel Master Fuel Management System" separately from the tank testing, tank monitor, electrical work and repiping.

41. The entire Larson job cost $32,300. On November 5, LAI issued check no. 11107 to Larson for that amount. **Exhibit E**. The remittance stub identifies the invoice and applies the full payment to it.

42. The Fuelmaster would remain the property of LAI through two stock sales.

43. Prior to CG's ownership of LAI, LAI and Mayfield had entered into an agreement that allowed LAI to manage the D95 Airport.

44. LAI and Mayfield put their respective roles in writing in the July 31, 2014 Commercial Operating Agreement. **Exhibit F**.

45. Mayfield gave LAI exclusive use of the main terminal and the fuel storage and dispensing facility. Exhibit F.

46. LAI kept the revenue from its business, paid its suppliers, provided self-service fueling around the clock and paid Mayfield ten cents for every gallon sold. *See* Exhibit F.

47. The agreement separately provided for Township payment of approved airport expenses and written approval of capital improvements. *See id.*

48. By the time Ronald and Betty Keil prepared to sell their LAI shares in 2018, the Fuelmaster reader had been on the company's books for nearly a decade.

49. LAI's Federal Asset Report dated February 5, 2018, for the year ended December 31, 2017, identifies asset 134 as "Fuelmaster FMV 2560 Smart Card." **Exhibit G**.

50. The Exhibit G asset report gives October 10, 2008 as the in-service date and $14,200 as the cost. By 2018, LAI had already fully depreciated the FuelMaster.

51. On April 25, 2018, the Keils agreed to sell all 670 shares of LAI to Gerald Raymond II. **Exhibit H**.

52. Two months later on June 22, Raymond agreed to sell those shares to CG Acquisitions, LLC ("CG"). **Exhibit I**.

53. LAI was a party to both agreements. As the company changed hands, LAI continued to sell merchandise from the cabinet and fuel through the FuelMaster.

54. Section 5.18 of each stock agreement required disclosure of any third-party interest in property used in the business or on the premises for which the business was responsible. *See* Exhibit H; Exhibit I.

55. Neither agreement disclosed any interest on the part of Mayfield Township in the FuelMaster or cabinet. *See id.*

56. In June, Raymond warranted to the best of his knowledge that LAI was the "sole and absolute owner" of the business assets covered by § 5.18. Although no Schedule 5.18 was prepared for either closing, Raymond's representation can be viewed in context as a warranty that LAI owned most, if not all, of the items at issue in this case.

57. After CG purchased the shares of LAI, Mayfield and LAI renegotiated their agreement.

58. The parties' restated commercial and management agreements took effect on September 11, 2019. **Exhibit J**.

59. LAI continued to run its business under the unmodified terms of the 2014 commercial agreement and undertook to manage the airport on Mayfield's behalf.

60. None of the agreements between LAI and Mayfield transferred the cabinet or the FuelMaster to Mayfield.

**Mayfield's objections and the property that vested in LAI at confirmation**

61. LAI still owned and held the cabinet and FuelMaster when it filed its Chapter 11 petition on November 5, 2021.

62. This Court administered LAI's Subchapter V case jointly with that of its shareholder, CG (Case No. 21-31511-jda).

63. In its January 21, 2022 schedule of assets, LAI listed "1 display cabinet" among its office furnishings. That entry identifies the lobby sales counter. Doc. 53.

64. In the same schedule LAI disclosed its lease of the airport premises and its pending contract suit against Mayfield in Lapeer County Circuit Court.

65. Mayfield contested LAI's right to continue under the airport agreements.

66. First, it invoked the asset-sale clauses after Chris Lewis assigned his membership interest in CG.

67. On August 17, 2022, this Court found that CG continued to own LAI and that LAI had not sold its assets. As a result, the Court allowed LAI to assume the agreements.

68. Mayfield objected to LAI's Chapter 11 plan and appeared at the August 29 hearing concerning confirmation of LAI's the Second Amended Plan. As the Court had already granted LAI's motion to assume the Mayfield contracts, Mayfield's counsel explained that Mayfield had one confirmation objection left.

69. This objection was a feasibility objection based on the fact that the airport agreements were expected to expire in September 2024. Mayfield questioned whether LAI could make its plan payments if it lost possession and control of the D95 Airport.

70. Although it was an active participant in the confirmation proceedings, Mayfield did not at any point claim to own the Exhibit B property, the sales counter, the reader, or a share of any of these items.

71. The exhibits at that confirmation hearing included both 2018 stock agreements. Mayfield had notice of both, and the Court admitted the exhibits collectively.

72. During the confirmation hearing LAI's president, Gene Kopczyk, also described how LAI issued cards for individual aircraft to activate the pumps. Using the fuel reports for two rental aircraft, he explained how the FuelMaster recorded gallons dispensed and the price per gallon so LAI could account for the fuel.

73. On October 12, 2022, the Court overruled Mayfield's feasibility objection. It denied confirmation of the Second Amended Plan on other grounds. Doc. 264, pp. 16–18, 24.

74. LAI then filed a Third Amended Plan (Doc. 267, the "Plan").

75. The Court held a confirmation hearing on October 26 and confirmed the Plan on November 4 under 11 U.S.C. § 1191(b). Doc. 273 (the "Confirmation Order").

76. As before, Mayfield did not raise its alleged interest in LAI's property during the proceedings related to the Plan.

77. Section 11.1 of the confirmed Plan vested "all property held by the Estates" in the reorganized debtors on the Effective Date.

78. LAI then owned the cabinet, the FuelMaster, and all of the other Exhibit B property.

79. As a result, all of this property vested in reorganized LAI, as did its contract claims against Mayfield.

80. The Plan required LAI to pursue the listed causes of action and to obtain this Court's approval before settling or abandoning any of them during the Plan term.

81. LAI continued to operate at the D95 Airport as it pursued its contract suit.

82. On June 14, 2024, the Lapeer County Circuit Court ordered Mayfield to pay LAI for outstanding invoices and attorney fees. **Exhibit K.**

83. Despite the state court's clear order, Mayfield did not pay LAI.

84. LAI vacated the D95 Airport on or about November 8, 2024, moving its operation to Bishop International Airport in Flint.

85. Norman Hill helped move the unanchored cabinet out on two dollies. The FuelMaster was also moved.

86. On December 13, more than two years after confirmation, the Township began to claim that LAI had taken Mayfield's personal property when it moved.

87. The Exhibit B list was first presented to LAI's counsel at this time.

88. All of the items in the list – including the FuelMaster and the cabinet – belong to LAI.


26-03064-jda Doc 1 Filed 11/25/26 Entered 11/25/26 17:17:48 Page 9 of 16

89. In connection with state court summary proceedings, Ronald Keil signed a January 30, 2025 affidavit identifying which equipment LAI owned when he and his wife sold their shares. **Exhibit L**.

90. The exhibit to that affidavit identifies asset 134, the FuelMaster, as LAI's property as of the April 2018 sale. Exhibit L.

91. The second exhibit to the affidavit lists a "Card Reader (Fuel Master)" as Township property. This affidavit exhibit is the same document attached as the Exhibit B list of property. Exhibit L.

92. The entire affidavit cannot be considered reliable when it first acknowledges that the FuelMaster is LAI's property, but then goes on to claim it belongs to the Township.

93. Moreover, the inconsistent affidavit reveals the (already readily apparent) bias of the affiant.

94. On March 5, 2025, LAI moved to hold Mayfield in contempt for failing to pay the June 2024 award. Exhibit A.

95. Six days later, Township Supervisor Dan Engelman reported to the Lapeer County Sheriff's Office that Kopczyk had taken Township property.

96. The next day, John Lewis – the same Township agent this Court directed Mayfield to keep away from the airport in 2022 - claimed that the Township owned half the FuelMaster and described the cabinetry as part of the real estate.

97. On March 18, 2025 LAI demanded the documents supporting Mayfield's claim of title.

98. To date, Mayfield has produced no bill of sale, Township payment record or contract provision showing that it acquired either item.

99. LAI and Mayfield were again in court in June, 2025. Mayfield remained in contempt of the state court order and still refused to pay.

100. On August 25, 2025 Mayfield finally paid the $152,741.92 award. An astonishing *one year and 72 days* after Mayfield first was ordered to pay.

101. LAI still had additional unpaid invoices and the attorney fees associated with continuing litigation. It sought payment of those amounts in circuit court on October 31, 2025.

102. As of November 20, 2026, over a year later, the state court still has not entered an order on LAI's motion for entry of judgment with respect to the invoices and fees.

103. In July 2026, the People charged Kopczyk with larceny of the FuelMaster and larceny in a building for taking a "custom half wall cabinet separating two rooms."

104. These are two of the items listed in the Exhibit B list of LAI's property that Mayfield claims were stolen from it.

105. The cabinet named in that charge is LAI's lobby sales counter.

106. The FuelMaster is the very same FuelMaster LAI has owned since 2008.

107. At the preliminary examination, former Airport Board chairman William Frank Thorman traced the cabinet to the DuPont family.

108. Norman Hill described rolling it out of the D95 Airport unanchored.

109. John Lewis acknowledged on cross-examination that he had no proof Mayfield owned the FuelMaster and no specific documentation that it owned the cabinet.

**Mayfield attempts to leverage the malicious criminal proceeding to escape liability.**

110. On November 17, 2026, after its own manager acknowledged those gaps in Mayfield's proof, the state court directed the parties to discuss potential settlement.

111. At this point, Township counsel told Kopczyk's counsel that the board had directed him to withdraw its criminal complaint in exchange for a global resolution of LAI's claims against Mayfield. **Exhibit M**.

112. Mayfield could not substantiate its ownership claim to either item. Nonetheless, Mayfield now attempts to use these charges as leverage to escape liability as to the claims against it which are being administered under the Plan.

113. The criminal charges have placed an enormous amount of pressure on Mr. Kopczyk.

114. The sheriff attempted to arrest him on a Saturday, hoping to cause him to spend a weekend in jail.

115. When that did not work out, Mr. Kopczyk was arrested on a Sunday at his home.

116. He was afforded no opportunity to turn himself in.

117. As a result, he spent a night in jail.

118. Mr. Kopczyk was injured during the arrest.

119. His arrest also caused revocation of his pass to enter the airport where LAI now operates.

120. It is almost certain that Mayfield was well aware that felony charges would cause Mr. Kopczyk to effectively be barred from being on premises at LAI.

121. Mr. Kopczyk has also lost his global entry status, and the US Department of State has refused to renew his passport.

122. Mr. Kopczyk has suffered in numerous other ways, and this Complaint only sets forth examples of the direct harm the criminal charges have caused to him.

123. Despite the false nature of the claims, Mayfield has used the theft charges against Kopczyk to pressure LAI to release or discount its remaining claims for payment. Exhibit M.

124. LAI and its creditors would bear the cost.

125. Under Plan § 4.1.1, net litigation proceeds collected during the five-year term go first to eligible unsecured creditors, pro rata up to their unpaid allowed claims.

126. If that pressure succeeds, Mayfield keeps money LAI otherwise could collect on a preserved claim and creditors have less to share.

127. By way of the confirmed Plan, this Court specifically retained jurisdiction to determine ownership of property. Doc. 267 § 12.1.2

128. As such, LAI now seeks a determination of civil title as between itself and Mayfield with respect to all of the Exhibit B items.

## JURISDICTION AND VENUE

129. The district court has jurisdiction over this case under 28 U.S.C. § 1334(b) and has referred this proceeding under 28 U.S.C. § 157(a) and E.D. Mich. LR 83.50.

130. Mayfield is a Michigan township with capacity to sue and be sued.

131. Count I seeks interpretation and enforcement of the Confirmation Order, a core matter under 28 U.S.C. § 157(b)(2)(L).

132. The Plan expressly reserves to this Court "the determination of all questions and disputes regarding title to the assets of the Estate." Doc. 267 § 12.1.2.

133. Sections 12.1.4 and 12.1.5 of the Plan also reserve authority to interpret and enforce the Plan and to enter orders enforcing the debtors' title.

134. Count II is related to the bankruptcy under § 1334(b) because determining what property vested in reorganized LAI pursuant to the Plan determines what LAI owns.

135. Venue is proper under 28 U.S.C. § 1409(a).

136. Under Bankruptcy Rule 7008, LAI consents to the bankruptcy court's entry of final orders or judgment in this proceeding.

**Count I — Revesting and the binding effect of confirmation**

137. Plaintiff repeats and realleges the above allegations set forth in Paragraph 1 through 136 and incorporates the same herein as though more fully stated at length.

138. LAI's interests in all of the items described in Exhibit B, including the cabinet and FuelMaster, became estate property at filing under 11 U.S.C. § 541(a)(1)

139. 11 U.S.C. § 1141(b) gives effect to the Plan's disposition of estate property.

140. Section 11.1 of the Plan vested the interests in the Exhibit B property in reorganized LAI,

141. Under 28 U.S.C. § 157(b)(1) and (b)(2)(L), this Court may enter judgment interpreting and enforcing that disposition in its own Confirmation Order. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009).

142. The Plan binds Mayfield under 11 U.S.C. § 1141(a) and Plan § 13.2.

143. All of the false Exhibit B property interest claims Mayfield now makes would have existed before confirmation.

144. Its cabinet claim rests on the cabinet's place in the building.

145. Its FuelMaster claim rests on an alleged and unsupported contribution to the purchase.

146. Mayfield asserted neither interest when it objected to the Plan, nor did it claim any of the other Exhibit B property.

147. LAI asks the Court to enforce the bar against Mayfield's belated challenge to ownership. *See In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458, 463 (6th Cir. 1991).

148. LAI requests entry of a judgment confirming that it is the lawful owner of all of the Exhibit B property.

**Count II — Ownership under Michigan law**

149. Plaintiff repeats and realleges the above allegations set forth in Paragraph 1 through 148 and incorporates the same herein as though more fully stated at length.

150. The competing claims to the Exhibit B property present an actual controversy.

151. 28 U.S.C. § 2201(a) permits entry of a judgment declaring who owns each item.

152. Bankruptcy Rule 7001 provides a means for adjudicating disputes relative to an interest in property under subdivision (b) and for a declaration of the parties' rights under subdivision (i).

153. Under the facts set forth above, it is clear that the Exhibit B property is the lawful property of LAI.

154. LAI thus requests entry of a declaratory judgment confirming that it is the lawful owner of all of the Exhibit B property.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiff, Lapeer Aviation, Inc. respectfully requests entry of a Judgment against the Defendant:

a) Interpreting and enforcing the Plan;

b) Determining that, pursuant to the Plan and the Confirmation Order, the Exhibit B property is the property of LAI;

c) Providing declaratory relief which determines, under Michigan law, that the Exhibit B property is the property of LAI; and

d) Awarding LAI any further or different relief the Court may deem just and equitable.

Respectfully submitted,

Date: November 25, 2026

/s/ Zachary R. Tucker
Zachary R. Tucker
Attorney for Plaintiff
G-9460 S. Saginaw Street, Suite A
Grand Blanc, MI 48439
(810) 579-3600
ztucker@winegarden-law.com